United States District Court
Southern District of Texas

**ENTERED**
July 10, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ORLANDO SANDERS, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:22-cv-03479 |
| | § | |
| ENTERPRISE OFFSHORE | § | |
| DRILLING, LLC, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me is a Motion for Summary Judgment filed by Defendant Enterprise Offshore Drilling, LLC ("Enterprise"). Dkt. 26. Having reviewed the briefing, the record, and the applicable law, I recommend the motion be **GRANTED** and judgment be entered in favor of Enterprise.

## BACKGROUND

Enterprise is an offshore drilling company that operates a fleet of offshore drilling rigs in the Gulf of Mexico. Enterprise entered into a management services agreement with White Fleet Drilling, LLC ("WFD") to manage several of WFD's rigs. Pertinent to this litigation, Enterprise operates the WFD Rig 250 ("WFD 250") on WFD's behalf. WFD contracts the WFD 250 to an affiliate of Arena Energy ("Arena"), who is the owner of the drilling location and "Operator of Record." I will refer to WFD and Arena, collectively, as "Owner."

On December 18, 2019, Plaintiff Orlando Sanders ("Sanders"), who is Black, began working for Enterprise as a roustabout. A roustabout's duties consist of cargo-handling, general cleaning, maintenance, and other manual labor as assigned. Sanders was assigned to the WFD 250 from December 2 to December 10, 2021. Because all relevant events in this case took place in December 2021, I will omit further references to the year 2021.

On December 8, Sanders and another roustabout, Zach Rehus ("Rehus"), were loading and unloading supplies from a crew boat with the assistance of crane operator Donald Picard ("Picard"). The crew boat was owned, operated, and crewed by a third-party company. That evening, Sanders and Rehus interacted with Nick Naquin, a white deckhand on the crew boat. The three exchanged a number of crude insults. It is disputed whether Sanders called Nick Naquin "queer," "gay," or "faggot." It is undisputed, however, that Nick Naquin called Sanders "nigga" a number of times during their interaction. Sanders protested against the use of that word and complained to the captain of the crew boat ("Joe," last name unknown). Sanders also told Picard, who told him to report it to Derek Caudill ("Caudill")—an Enterprise Toolpusher and Picard's supervisor. Sanders told Caudill he wanted to report the incident to the Owner's "Company Man."

There were three Company Men on the WFD 250: the lead representative, Tory Franklin ("Franklin"), Edward Green, and Marcus Holt. It is disputed to which of the Company Men Sanders initially reported this incident, but it is undisputed that Sanders and Rehus both provided written statements regarding their encounter with Nick Naquin, and that these statements made their way to Franklin on behalf of the Owner, the Enterprise Offshore Installation Manager Phillip Brown ("Brown"), the onshore Enterprise Rig Manager James Aday ("Aday"), and Enterprise's Vice President of HR, Travis Fitts ("Fitts").

Sanders and Rehus spoke with Brown regarding the encounter. Sanders has testified that Brown blamed Sanders and Rehus for Nick Naquin's racial slurs and warned them that they would have repercussions.

At some point between the evening of December 9 and the morning of December 10, while sweeping the welder's shop, Sanders encountered Enterprise welder Jerry Naquin, father of Nick Naquin. As Sanders passed by, Jerry Naquin kicked Sanders's dustpan away from Sanders, threatened Sanders to stay away from the welder's shop, and cursed Sanders for getting his son fired.

Later, at breakfast, Sanders complained to Caudill for not telling Brown that Jerry Naquin had kicked Sanders's dustpan and cursed at him. Caudill then took Sanders to Brown's office to discuss the incident with Jerry Naquin, who refused to apologize. Sanders has testified that, rather than listen to his complaints, Brown told Sanders to calm down.

That evening during dinner, Sanders complained to a co-worker about his experiences with both Naquins, and his dissatisfaction with how his complaints were being handled by management. What Sanders said is hotly disputed. Enterprise claims—and has provided sworn statements from employees who were at breakfast—that Sanders said he was going to: 1) "bitch slap Phillip Brown's racist ass"; 2) "punch Derek Caudill's punk ass in the throat"; 3) "beat the fuck out of both of them at the dock"; and 4) beat Jerry Naquin to a "bloody pulp." Dkt. 26 at 19. Sanders denies making such statements. At least one witness also swears that Sanders called Franklin a racist to his face, and said that Brown was racist. Franklin told Sanders to take his problems to Brown and not to involve his co-workers.

After dinner, Franklin relayed his version of events to Brown. Brown relayed Franklin's concerns to Aday, who was onshore. Aday reported the incident to Fitts, who was also onshore. Fitts told Aday to gather statements from the crew. Aday told Brown to put Sanders on the next boat to the shore, and arranged for a boat to go and get Sanders.

A few hours after the dinner exchange, Sanders was summoned to Brown's office. What Brown said to Sanders is disputed. Sanders claims that Brown fired him. Enterprise claims that Brown told Sanders his conduct was unacceptable and that he was bringing down the morale on the rig. It is undisputed that Sanders got his things and left on the boat that had been arranged without issue.

A few days later, on December 13, Sanders called Enterprise Senior HR Specialist Jill Bonvillain ("Bonvillain") to ask about his situation. Sanders told Bonvillain that Brown had fired him. Bonvillain referred Sanders to Fitts. On

December 16, Fitts and Sanders spoke on the phone, at which point Fitts told Sanders that he was fired for insubordination, threatening other crewmembers, and calling the Company Man (Franklin) a racist.

Sanders filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 20, 2021. The EEOC advised Sanders of his right to sue, and Sanders filed this lawsuit on October 10, 2022. Sanders brings claims of race discrimination and retaliation under 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964; and Chapter 21 of the Texas Labor Code ("Chapter 21"). Sanders also brought hostile work environment claims under Title VII and Chapter 21. Discovery is complete, and Enterprise has moved for summary judgment on all claims. In his summary judgment response, Sanders abandoned his hostile work environment claims. *See* Dkt. 45 at 9 n.2 ("Sanders will proceed only on his race discrimination and retaliation claims."). Thus, I will analyze whether summary judgment is proper only on Sanders's race discrimination and retaliation claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Harville v. City of Houston*, 945 F.3d 870, 874 (5th Cir. 2019) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record that] it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmovant bears the burden of proof at trial, he must "make a showing sufficient to establish [each] element essential to [his] case." *Id.* at 322. The nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts,

by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quotation omitted). Rather, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015). At the summary judgment phase, I construe "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020).

## EVIDENTIARY OBJECTIONS

Before turning to the summary judgment analysis, I must address Enterprise's evidentiary objections. Enterprise insists that Sanders should not be permitted to rely on the November 8, 2023 Aday deposition in his summary judgment response. I agree.

In a November 8, 2023 Order—expressed as a minute entry—I held that "the deposition of James Aday taken today without defense counsel present cannot be used in this matter." Dkt. 49 at 6 (quoting Dkt. 32). The reason I expressly prohibited use of the November 8, 2023 deposition transcript is because I found that Enterprise did not receive "reasonable written notice" of the deposition. *See* FED. R. CIV. P. 30(b)(1). In addition to my November 8, 2023 minute entry, I subsequently granted Enterprise's Motion to Strike Aday's November 8, 2023 deposition. *See* Dkt. 46 at 4. In that Order, I unequivocally said that "[t]he November 8, 2023 Aday deposition transcript is a nullity." *Id.* "[T]he November 8, 2023 Aday deposition transcript cannot be used in this matter. No exceptions." *Id.* I then specifically noted that "[t]he November 8, 2023 Aday deposition transcript cannot be offered in an attempt to create a fact issue at the summary judgment stage." *Id.* Accordingly, I have not considered any statement in Sanders's briefing that is supported with a cite to Aday's November 8, 2023 deposition transcript. Furthermore, any arguments based on conflicts between Aday's November 8, 2023

deposition and Aday's December 1, 2023 deposition are—like the first Aday deposition itself—null and void.

## ANALYSIS

At the outset, I note that § 1981, Title VII, and Chapter 21 discrimination and retaliation claims are all analyzed under the same framework. *See Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) ("The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims."); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012) (observing that plaintiffs' race discrimination and retaliation claims under § 1981, Title VII, and Chapter 21 "are analyzed under the same standard"); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001) ("[A]nalogous federal statutes and the cases interpreting them guide our reading of [Chapter 21]."). Accordingly, my analysis for both claims is identical and all references to Title VII apply with equal force to Sanders's § 1981 and Chapter 21 discrimination and retaliation claims.

### A.    *MCDONNELL DOUGLAS* BURDEN-SHIFTING FRAMEWORK

The familiar *McDonnell Douglas* burden-shifting framework applies to Sanders's race discrimination and retaliation claims. *See Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). Under the *McDonnell Douglas* framework, Sanders must first establish a *prima facie* case of discrimination or retaliation. *See id.* If Sanders carries his burden, then Enterprise must provide a legitimate, nondiscriminatory reason for his termination. *See id.* If Enterprise gives an adequate, nondiscriminatory reason for Sanders's termination, the burden shifts back to Sanders, who "must then prove, by a preponderance of the evidence, that the proffered reason was mere pretext for discrimination." *Id.*

"If the employer produces any evidence, which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action, then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (quotation omitted). At that point,

"[Sanders] must present substantial evidence that [Enterprise's] legitimate, nondiscriminatory reason for termination is pretextual." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016) (quotation omitted). This means "[Sanders] must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of [Enterprise's] decision." *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). "The quality and weight of the evidence determines whether it is substantial." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021).

"A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quotation omitted). "[T]o establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (cleaned up). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton*, 333 F.3d at 578.

**B.    I WILL ASSUME THAT SANDERS CAN ESTABLISH A PRIMA FACIE CASE.**

To establish a prima facie case of discrimination, Sanders must show that he "(1) is a member of a protected class; (2) was qualified for [his] position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, . . . others similarly situated were treated more favorably." *Okoye*, 245 F.3d at 512–13 (cleaned up). To establish a prima facie case of retaliation, Sanders must show that (1) he "engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Abbt v. City of Houston*, 28 F.4th 601, 610 (5th Cir. 2022) (quotation omitted).

Because the burden for establishing a *prima facie* case is "very minimal," I will assume, without deciding, that Sanders has established a *prima facie* case of both discrimination and retaliation, and proceed to the remaining steps of the burden-shifting framework. *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) ("To establish a prima facie case, a plaintiff need only make a very minimal showing. Therefore, we assume *arguendo* that [the plaintiff] has established a prima facie case." (cleaned up)). The question then becomes whether Enterprise has offered a legitimate, nondiscriminatory reason for terminating Sanders's employment and, if so, whether Sanders can satisfy his pretext burden.

## C.   SANDERS CANNOT ESTABLISH PRETEXT WITH A CAT'S PAW ANALYSIS.

Enterprise asserts that Sanders was fired for threatening his co-workers. Firing an employee for threats of violence is a legitimate, nondiscriminatory reason for termination. *See Cerda v. Blue Cube Operations, L.L.C.*, 95 F.4th 996, 1003 (5th Cir. 2024) (threatening to expose co-workers to COVID-19 was a legitimate, nondiscriminatory reason for termination); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 489 (5th Cir. 2004) (threats of "physical violence, in violation of company policy" were "sufficient to establish an alternate, legitimate justification for Pineda's termination that would negate causation"); *Taylor v. Seton Brackenridge Hosp.*, 349 F. App'x 874, 877 (5th Cir. 2009) (employer had a legitimate, nondiscriminatory reason for terminating plaintiff "because he verbally harassed a co-worker"). Indeed, Sanders does not dispute that making threats against one's co-workers is a legitimate, nondiscriminatory ground for termination. Rather, Sanders disputes that he made such threats. Sanders argues that, with respect to pretext, he "presents evidence that the cat's paw analysis applies, considering Brown . . . fed [presumably false] information to influence decisionmakers to terminate Sanders." Dkt. 45 at 27.

The Fifth Circuit has explained the "cat's paw" theory of liability this way:

8

Plaintiffs use a cat's paw theory of liability when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any [discriminatory or] retaliatory animus. Under this theory, a plaintiff must establish that the person with a [discriminatory or] retaliatory motive somehow influenced the decisionmaker to take the [adverse employment] action. Put another way, a plaintiff must show that the person with [discriminatory or] retaliatory animus used the decisionmaker to bring about the intended . . . action.

*Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015).[1]

"In pretext cases, it is not enough that the company was wrong about the underlying facts that motivated the adverse employment action. The only question is whether the employer had a good-faith belief that the facts that motivated the adverse action were true." *Lucas v. T-Mobile USA, Inc.*, 217 F. Supp. 3d 951, 957 (S.D. Tex. 2016). "To invoke the cat's paw analysis, [Sanders] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'" *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)).

Sanders cannot satisfy either prong of the cat's paw analysis. I will assume, however, for the sake of argument, that Brown possessed discriminatory animus.

---

[1] The United States Supreme Court has explained how the term "cat's paw" came to be:

The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990. See *Shager v. Upjohn Co.*, 913 F.2d 398, 405(CA7). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

*Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011).

Even so, Sanders cannot show that Brown possessed leverage or exerted influence over Fitts.[2] Fitts has provided a sworn statement that his decision was informed by written statements from multiple crewmembers, including Franklin, the lead representative for Enterprise's customer. *See* Dkt. 58. "Even if [Brown] was motivated by discriminatory animus in forwarding the [statements regarding Sanders's threats] to [Aday and, in turn, Fitts], the [statements themselves] originated not from [Brown], but from . . . neutral third part[ies]." *Wojcik v. Mem'l Hermann Health Sys.*, No. CV H-17-3198, 2019 WL 4887265, at \*5 (S.D. Tex. Oct. 3, 2019) (rejecting plaintiff's cat's paw theory because plaintiff could not show that the titular decisionmaker "acted as a rubber stamp, or the cat's paw, for the subordinate employee's prejudice" (quotation omitted)). Sanders offers no explanation, and certainly no evidence, for how Brown's alleged animus influenced the statements of these neutral third parties. For this reason alone, Sanders cannot prevail on his cat's paw theory.

Sanders attempts to discredit Fitts's sworn statement that he relied on written statements from crewmembers by questioning the provenance of the statements themselves. Sanders argues "none of the statements were sworn," "three of the statements are not dated," and "one of the statements is not signed." Dkt. 45 at 23. Yet, Sanders points me to no law suggesting that an employer must receive sworn, dated, or signed statements in order to have a good-faith belief that the facts that motivated the adverse action were true. Sanders contends "there is a question of who created them and when they were actually received, considering some of the statements were not received by Aday." *Id.* In a footnote, Sanders observes "that Aday never testified to . . . receiving and forwarding any of these

---

[2] As Enterprise notes, Sanders's "own disclosure and production of a secretly audiotaped recording he made of the December 16, 2021 call between himself and Travis Fitts" demonstrates that Sanders did not know he was terminated until December 16, 2021, and that it was Fitts who terminated Sanders. Dkt. 49 at 8; *see also* Dkt. 49-1 at 2 (Sanders asking Fitts, "So, I'm definitely fired?"). Thus, Fitts is the "titular decisionmaker" for any cat's paw analysis.

written statements." *Id*. n.21. Yet, Sanders overlooks that Fitts has sworn that Aday emailed him three statements on December 15, 2021, including "a statement typed by Tory Franklin (the lead Company Man)." Dkt. 58 at 3. Moreover, Exhibit 6 to Fitt's sworn statement is an email from Aday to Fitts on December 15, 2021 with the subject line "Orlando Sanders Witness Statements." *Id*. at 28. Accordingly, whether through a cat's paw analysis or otherwise, Sanders cannot establish that Enterprise's reason for terminating him is false or unworthy of credence.

## D.   SANDERS CANNOT ESTABLISH PRETEXT THROUGH DISPARATE TREATMENT.

"[T]o establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye*, 245 F.3d at 514 (cleaned up). Sanders contends that he can prove disparate treatment because neither Nick Naquin nor Jerry Naquin were disciplined for their racism and physical aggression towards Sanders. There are several problems with this argument. First, whatever happened to Nick Naquin is irrelevant to any disparate treatment analysis because it is undisputed that Nick Naquin was not an Enterprise employee, and Enterprise had no right or authority to discipline Nick Naquin. *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (circumstances not identical where employees had different supervisors). In any event, the record shows that Nick Naquin was fired—that is indeed the very reason that Jerry Naquin kicked Sanders's dustpan and cursed Sanders. Thus, Sanders cannot use Nick Naquin to establish disparate treatment.

Nor can Sanders use Jerry Naquin to establish disparate treatment. At most, Jerry Naquin "kicked Sanders'[s] dustpan away from him, threatened him to stay away from the welder's shop and called him a motherfucker in anger." Dkt. 45 at 16. Jerry Naquin did not disrupt an entire galley's mealtime by threatening to "bitch slap," "punch," and "beat" multiple people—in the presence of the lead

11

representative for his employer's customer (Franklin, the Company Man)—and then insult the Company Man by calling him a racist. Dkt. 26 at 19. Employees who commit the same violation but to different degrees of severity are not "nearly identical." *Okoye*, 245 F.3d at 514; *see also Cerda*, 95 F.4th at 1003 (affirming district court's finding that plaintiffs' co-workers who allegedly "took extended lunch breaks and were never punished" were not similarly situated because there was "no evidence that those employees took as many extended lunch breaks as [plaintiff]"). Thus, Sanders cannot establish pretext through disparate treatment.

\* \* \*

Because Sanders cannot establish that Enterprise's legitimate, nondiscriminatory reason for terminating his employment was pretext, his race discrimination and retaliation claims fail.

## CONCLUSION

For the reasons discussed above, I recommend Enterprise's Motion for Summary Judgment (Dkt. 26) be **GRANTED**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 10th day of July 2024.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

12